First matter for oral argument this morning is South Allegheny Pittsburgh Restaurant Enterprises LLC versus the city. Mr. Tucker. May it please the court, my name is Richard Tucker. I'm counsel for the appellant, South Allegheny Pittsburgh Restaurant Enterprises LLC, sometimes known by its acronym of SAPRAE. Thank you for pronouncing it. My chambers and I have had a great difficulty in recent weeks trying to figure out whether it's SAPRAE or SAPRAE or, yeah, well, English. Can I ask at the outset for purposes of due process here, both of your due process claims, of course, we've got to have a property interest at stake here and the property interest is going to be defined by state law. So what is the property interest? The property interest is the right to pursue a business and livelihood, your honor. Any business, any livelihood? Any lawful business or livelihood. And that was, so you're not proceeding on any kind of entitlement theory here under law? Or a licensed business, you still have the license? We had a license, we had every license we were able to get. Do you have it now is the question. Was your license revoked to rescind it? The license was, the license was never revoked. We were closed down. Okay. That was the problem. In other words, after the court of common pleas decision, did you reopen? No, it was too late. Why was it too late? Because the business had been shut down. They had lost all of the income that they were going to have. They had a leasehold. But why not start it up again? Why weren't you able to open the business? They lost the lease. No money to pay the lease. Okay. They were closed. They were totally put out of business. And that's in your complaint? That the loss here is the loss of the lease because of the loss of income? I believe that is in the complaint. Yes, your honor. It is. Your honor, before I get started, I just, with the court's permission, I'd like to refer, reserve two minutes for rebuttal. The city. So if you didn't attempt to reopen. But you couldn't. So the city hasn't given any notice of noncompliance since the court of common pleas decision in May 15th of 18. And as far as I know, they haven't taken any action at all. There wasn't any action to take because we're not we're not there. We can't be there. We lost our lease. Let's let's go back to judge. Chief Justice Smith's first question is. The right that you're claiming is is property right is what a license to operate a business. Is that right now? We've had the license. That's the that's the that's the important. But what I'm trying to do is see if we can narrow to some extent or more clearly define what the property interest is here. Is the property interest in any way defined by the use that was being made here at the time of the stop work order? That is, I think, under the zoning code, it was called Restaurant General Restaurant General Restaurant General. And we had a license to to pursue that business. Do you call it a license or is it a certificate of occupancy? Or what is what is the term of art used under the city's zoning code? It has to be a certificate of occupancy, doesn't it? Yeah. Yes. The certificate of refreeze that we had a certificate of occupancy to operate Delaware. Delaware follows Pennsylvania. And I think that's what we call it. Anyway, I'm sorry. Well, you're you're following a very wise path. And if you're following Pennsylvania, I want to avoid the word license only because we're talking about a business here that clearly and intentionally does not have a liquor license, which is a completely separate and meaningful distinction for Pennsylvania operational and legal purposes. I'm sorry. Yes. It has a certificate of occupancy to operate as a restaurant general with dancing. Point out. But no live music. But no. But no live music. Yes. Live entertainment. I've entertained was prohibited under the special exception that had been granted to operate a bar and license on the first floor of these particular premises. And what kind of were you advised by Ellen? I before the place opened as to what you needed to do to make sure that you were in compliance with the CEO. They came they came out on July 15th and inspected the premises, told them, made recommendations as what they needed to do in order to be able to operate. And they did that. They did whatever they were recommended to do when the department came out and inspected. In fact, the department came out several times during the course of the months of July and August, while Sapre was spending substantial sums renovating the premises so that it could operate as a restaurant with dancing. And yet the zoning officer shows up together with a one police officer initially on the very first day of operation. Right. What? Certainly in the post Twombly and Iqbal world, we must look at complaints with a view toward plausibility. And while it would be incorrect to say that we can draw inferences from the face of a complaint as we do from evidence, we are called upon nevertheless to take an additional step when we are inquiring as to plausibility than what we once would have done in a pre-Twombly and Iqbal regime. What is there anything with respect to the plausibility we give to the averments of your complaint here that we ought to draw from the fact that this occurs on the very first day of operation? Well, I think the inference that you can draw is that someone told them they wanted this business closed. They came out clearly prepared to close it down. They came out with 20 police officers, even though. Twenty eight. I'm sorry. Did I say something different? You said 20. I thought it was 28. Approximately. I'm sorry. Approximately 28 police officers. They were going to close it down no matter what they found. I think that's the inference that you draw from what came particularly because Inspector Mariani and a police officer had sat outside the building from about 12.15 a.m. on September 4th for a period of time watching what was going on and saw nothing, absolutely nothing that would warrant police. I mean, how do you know that and how are we to conclude that from the face of a complaint at the motion to dismiss stage that they saw nothing? How are you to conclude that? I think you're permitted to draw reasonable inferences. Well, this is this is a business that is intended to draw a clientele that is the under 21 crowd, i.e. no lawful drinking going on there. But isn't it reasonable for anyone reviewing this complaint to conclude that there's a heightened concern that is a public interest that is vindicated by the zoning officer surveilling and making sure that that is indeed the kind of clientele that is going in and out of this business, especially on the very first day it opens. That's what they were doing when they were sitting in the police car. They were observing to see whether there was anything going on and there wasn't. That's the problem. It was no cause to go back and get 28 police officers and go in and close down this establishment. I don't mean to quibble here, but I don't see how we know that they saw nothing or that there was nothing going on at the time it was being surveilled. I think we do know from the complaint that nothing was determined after they entered. I think we know from the, I think we allege in the complaint they saw nothing. They saw nothing. And also it's on page seven of the Court of Common Pleas opinion. I'm sorry. It was also on page seven of the Court of Common Pleas opinion. But again, since we're talking about plausibility, how is it plausible that merely at the complaint motion to dismiss stage, you know without having taken a deposition or pursuit of the discovery what Mariani and or the officer saw or didn't see? Well, all I can say is he only gave one reason for closing them down. And it wasn't because he had seen something unlawful happen. He gave the reason for closing them down because he didn't think they looked like a restaurant. To him, they didn't. He told Brandon Furman, the owner of Sapre, he said, this restaurant doesn't look like an Eaton Park to me. Now, to those of you who are not familiar with Eaton Park, it's a chain of restaurants in western Pennsylvania. Tucker in you're in Pittsburgh. So, you know, Altona Eaton Park is no cuisine. That's an assumption. Do you know Altona? I'm sure he does. I don't know. Well, I know. I'm not sure I've ever been there, but I know. But that was his only reason. He didn't even know what the definition of a restaurant was under the zoning code. He was just taking something out of the. And how is it, you know, that at the stage of this litigation, when you simply filed a complaint that he doesn't know the. He had testified to that, your honor. And we put it in the complaint. He testified he was. And that's at the zoning. That is at the at the zoning here. It was. I don't remember whether it was at the zoning. It may have been a preliminary injunction here before Judge James. Now, it may have been. I think it may have been at the preliminary injunction hearing. OK. And even you want the opportunity to take discovery to get past. I'm sorry. You want the opportunity to take discovery to establish a record. Right. We haven't been able to take discovery, but we've alleged the facts. And luckily, we had some testimony. And that was one of the things we admitted. He didn't know. He didn't know what he didn't know. He didn't know the standard that he was supposed to be applying. He knew what a restaurant was. Yeah. What a restaurant was. Finally, it just didn't look like one to him. How far away is Jimmy D's and what's the other one, Howl at the Moon? How far is that away from, is it Mother Fletcher, the restaurant we're talking about? How far away from what? How far away from. Jimmy D's and Howl at the Moon. From your restaurant. Several blocks with respect to Jimmy D's. And I think it's two and a half miles. One is the other side of the river, isn't it? It's on the other side of the river. But the important thing is we're not talking about the equal protection argument. Yeah. Right. And with respect to the equal protection argument, it's similar in all relevant respects. How? The entire business plan, the market to which the businesses are appealing, are decidedly different. Both Howl at the Moon and Jimmy D's have liquor licenses, right? That's correct. They're appealing to an over 21 crowd. But the law is that they have to be similar in all relevant respects. And where the basis for closing them down was that they weren't operating a restaurant, i.e. not serving enough food, presumably. Then that's what you need to compare. All right. Compare to Jimmy D's that has no, that serves no food whatsoever. Howl at the Moon that serves no food whatsoever. And they haven't been closed down. They haven't been rated in a similar fashion. That's why there's a violation of equal protection of the laws. And we in the complaint, we went into great detail about what those two were specifically to show that it wasn't just a general allegation. We believe there are others, by the way, as I think we say in the complaint. But those are the but those are the two that we describe in great detail. Isn't your strongest argument by far the procedural due process argument? I'm sorry. Is it your strongest argument by far the procedural due process? Yes. Yes, it is. Really. And that would be what I want to emphasize the most, because the process that was provided here simply was not appropriate. We'll have you back on rebuttal then. Thank you very much. Miss Corn. Am I pronouncing your name correctly? Yes. Corn, you're from the city solicitor's office. That's correct. Who is the city solicitor in Pittsburgh now? Thank you. May it please the court. Julie Corn on behalf of the city and the other appellees. The city solicitor currently is Yvonne Hilton. She's been city solicitor for a number of years now. I believe about a year and a half, maybe two years. Well, you've heard the questions from the panel directed to Mr. Tucker. And I think one thing that is clear from the questions that all three of us have asked is the seeming oddity of having 28 police officers led by whoever their ranking officer was, together with a city zoning official, surveilling and then going into this business that caters to an under 21 crowd on the night of its very first day of operation. Don't we have reason to be skeptical of those circumstances as they are outlined in the complaint? Your Honor, I would submit that no, there's no reason to be skeptical of that. Why show up with 28 officers when they didn't see anything before? No violation of the code other than possibly something wasn't operating under its CO authorization. There was no violence, no drugs, no alcohol. 28 police officers when they don't see anything. And that's like killing a gnat with a shotgun. I mean, it's crazy. It is. And plus, Mr. Mariani comes in. He's shutting them down because it doesn't look like a restaurant. But he doesn't know where the restaurant is. And he's asked, I think, at least the allegation is, well, what's the restaurant? I don't know. So if they had a little steak tart to go with the pretzels, would that have been enough to get them over the hoop? Your Honor, I can address both of those questions. First, with the police force. I mean, the number of police officers to bring when you're enforcing a zoning stop work order would be up to the discretion of those enforcing it. Mr. Mariani is not a police officer, and it would not be inappropriate for him to ask for some accompaniment. Some accompaniment? Yes. An army. Some accompaniment. I can't speak to his comfort level with enforcing a stop work order. I was the district attorney of a county and occasionally showed up and accompanied a police officer at raids. I don't think I remember any situation in my years as a district attorney or as a prosecutor showing up for a drug raid with 28 police officers. And I would just submit we know from Appellant's complaint that there was at least 70 patrons there at some point in the night. So if they're all under 21. But not at 1215 when Mariani was there. I don't know how he would have known that there would be empty violations. No, he was there at 1215. They came back at 1235. He was there with one individual at 1215 according to the Court of Common Pleas decision. Nothing was going on. The place was empty. So at 1235, he shows up with 28 police officers. I mean, I literally can't make sense out of what's going on here. I can't either. There's a back story here. I kind of wish I knew what it was. But there's a lot more going on here than we've been privy to. But it makes no sense. And as I read your brief, I'm looking for the word nuisance or emergency. It's not there. So if they're not, even if they're operating a nuisance, unless a nuisance constitutes an emergency, you serve them with notice. You give them an opportunity to defend. They may or may not be able to get to the state judge higher in time to classify nuisance as a crime.   Mr. Mariani's mind is a restaurant. Maybe there's little hot dogs wrapped in rolls that everybody likes. Maybe that would get them over the restaurant bridge. I don't know. But this is ridiculous. I think, Your Honor, when it comes to the amount of police officers and the type of definition of restaurant, whether or not there was one police officer with Mr. Mariani or 28 doesn't necessarily affect whether or not the Department of Permits, Licenses and Inspections was able to issue a stop work order. What did they issue the stop work order for? They issued the stop work order for it not complying with the occupancy permit of it being a restaurant. And that certainly can be a valid basis for a zoning violation, right? Yes, that is correct. But it would not seem on its face to be a basis for a stop work order on an emergency basis. And that's precisely what Judge James found, isn't it? That there was not an emergency. Also, the person shutting down the restaurant knew what a restaurant was. Well, there is a common sense application to figure out the definition of a restaurant. We know that appellant alleged that they were selling potato chips and Pop-Tarts, which is more like a vending machine than it is a restaurant. Additionally, as you stated before in your questions, we know that this is a company or a business that's operating specifically to cater to people that are mostly minors, under 21-year-olds. So if you're not selling food... But the only relevance of being under 21 is you can't have alcohol there. Other than that, does it matter if they're 21 or as long as they're not doing anything, not committing any crimes, and there's nothing here, there's no drugs, no alcohol. And you call that, I guess, an underage nightclub. He calls it a restaurant, like the dueling terms in the brief. I believe the judge has called it that. There's no alcohol, and there are no drugs on the premises. If the police saw it, anybody saw it. And there's no violence. So whenever he goes in and he finds out that this is an under 21-year-old nightclub that is being purported to be a restaurant serving food, and it's not necessarily serving food in the common sense way or application of a restaurant, it is within the discretion of the Department of Permits, Licenses, and Inspections. Checking down with no notice, no opportunity to defend, no hearing, nothing. And you can only do that when there's an emergency. What was the emergency? The emergency was the concern for the age of the individuals that were being catered to. But they're going to be eating stale potato strips? There was no one there. Where was the emergency? The position of the city is that the emergency was the area of the city that it was in, normally caters to, as Appellant has already pointed out, to people who are over the age of 21 and who are drinking alcohol. So if you're under 21, there's an emergency if you open a restaurant, and it's not quite deemed to be a restaurant under the CO that exists. Well, if you open a restaurant that is not actually a restaurant and you advertise it as the largest under-21-year-old dance party in the tri-state area and the craziest party in the city of Pittsburgh, and you attract a large group of underage individuals and then they leave at the same time from this restaurant or club, at the same time that people are leaving from other bars and restaurants, late at night, without ways to get home, yes, it is an emergency. It's an emergency? You've got to be kidding me. I can understand that there should be a heightened interest on the part of government for a group of people who are under 21 and perhaps substantially under 21. I think we're talking about a different group of people who perhaps require some kind of heightened attention from city officials just to assure their safety and well-being. To me, that strikes me as a legitimate police power concern, public policy concern. But that in and of itself doesn't get you across the line to an emergency. I mean, that specific concern that is supported or could be supported as a legitimate exercise of the police power, which is to surveil, perhaps to give a heightened scrutiny to the operation of this entity, doesn't immediately translate into an emergency, does it? Well, we're not necessarily looking later on after we know all this. We're doing that anyway because aren't we really bound, as a matter of full faith and credit, to Judge James' determination that there was no emergency? Well, he determined that afterwards, at the time that the stop work order was issued. But we're here afterwards, too, and after his determination. It was a matter of discretion for the appropriate code enforcement officer, which would be Mr. Mariani, and he exercised his discretion. And whether or not his discretion was correct or not is something that would essentially fall under his protection for qualified immunity. Well, what did he see that would cause a reasonable person in his situation to believe that this was such an emergency that they had to act immediately and they couldn't just give them some kind of notice and opportunity to defend and inquire? Because you're arguing that a situation where a 21-year-old is allowed to go in and get absolutely plastered and come out of the restaurant and go into the parking lot where his or her car may be parked, that's not an emergency. But a 20-year-old going into a place where they're selling potato chips and pretzels and Coca-Cola and leaving, that is an emergency. That makes no sense to me. You said they didn't have a way to get home. One, you don't know that. And two, so what? Well, in this particular case, we know that we have an occupancy permit that allows for a restaurant. So we have a business that's putting it – I like the idea of a restaurant. Mariani said he didn't even know what a restaurant was under the code. I don't know how that helps you. Well, he – What is a restaurant? Tell me, how is it defined? How is a restaurant defined? A restaurant is defined as a place that sells food on – Define food for me. Would that be – We're not back to the old vegetables is ketchup era. Forget that. Prepared food. Define food. Prepared food that's available for consumption at the time it's served. How is this not fit that definition? Because the restaurant was not preparing the food. They were just buying vending machine snacks. And the common sense application of food that's being prepared would be in a kitchen. We do know from the – They have to have a kitchen. They did have a kitchen, but they weren't using it. So we have a situation where we have a business that's holding itself out to be a restaurant, then advertising that it's the biggest under-21-year-old nightclub in the tri-state area to attract a certain type of clientele. And here's the fact that the food was not prepared on site. Is that what's driving this? I believe it's a part of it, yes. And that would constitute an emergency. That, coupled with the fact that they're advertising it as something other than a restaurant and something that would attract under-21-year-olds and possibly minors, that the city does have a heightened – Anybody under 21, I think, would be a minor. Yes. Yes, or under 18. It depends on how you define that. A young, youthful crowd of people that may not have the same type of ability to make judgments that people in other parts of that same area or the city need to. Judgment is the work. Whether or not they want the salt on the potato chips or not. What judgment are we talking about here? Judgment is if an occupancy permit is not being followed. The city does have an interest in wanting to enforce the proper type of business within the occupancy permit. And especially if the type of alteration or moving away from the occupancy permit is to something that causes a potential for an emergency and something that, if it was left open, would attract. So many slippery slopes in there, a potential for an emergency. You can't assume a situation that is not a potential for – everything is a potential for an emergency. That doesn't – you're saying that if the city sees something that's a potential for an emergency, that gives them the right to act as if it was an emergency. Forget about pre-deprivation, notice, and process. Go in immediately and close them down because there's a potential for an emergency. Not necessarily. We know what the facts were here, as I've explained about the occupancy permit and the type of business that was actually being advertised. And then we have an individual who has the authority. Was false advertising? Mr. Mariani has the authority to use discretion for this emergency stop order. And he did exercise that discretion. He doesn't have to have informed discretion. Doesn't he at least have to know where the restaurant is that he's – What's the protocol that you normally follow if somebody's not in compliance with the CF? Well, in this particular case – 924.05? I'm sorry? 924.05? Yes, yes. And that's notice and an opportunity to cure, right? Yes, but there's an exception to that when there is a discretion exercise believing that there could be an emergency situation. If there's an emergency. Yes. And that's how – and sees nothing untoward but then shows up 20-some minutes later with 28 police officers. He had one with him at 1215. And the Court of Common Pleas says there was no emergency. How can you – I mean, we're not dealing with qualified immunity now. We're dealing with not following the protocols that are in place at the city. And the Court of Common Pleas judge said, look, if you think there's still a problem, you can, after the decision came down in May of 2018, you can go ahead and process and give them notice. I guess there was no need to do it because the place was closed. So the question then becomes, okay, if they get shut down and there is deemed by a court in a fairly comprehensive opinion with some testimony not to be an emergency and the other side then proceeds on the previously staked case in district court, why does that not continue, at least on the pre-deprivation process? In this particular case, he exercised his discretion. We know that discretion that is afforded to officers – And the court said that his discretion was arbitrary and capricious. And that in and of itself, and the judge ruling in favor of the appellant, essentially was the process that was afforded. We know that there's not a – But now they're closed down and they lost their lease. I mean, there's a back story here. I don't know what the heck it is because it looks like the person who was running the place was cooperating supposedly with L&I. L&I was apparently giving advice. Something happened over the summer before the place opened on Friday, September 3. They closed it down three or four hours later. And I can't figure out what that is. But even the mistakes in discretion and any kind of due process violation at the state court level – I'm sorry, the mistake in process whenever the appeals were going to the common police court doesn't necessarily then create a federal cause of action, which is essentially our position on almost all of the cases. Well, a certificate of occupancy to operate a business is a property right, at least under – What subject of discretion of – Midnight Sessions is a case from our court, 945 F. Second 667. And that talks about the operation of business as a property right. That property right was interfered with to the point where they cannot reopen. They have – all the money they put into it is lost. So when it comes to the money, they said that the money was for a dance floor, which wasn't necessarily required by the permit. So that is – Above and beyond. That has no use. So that, I mean, is a subject that's beside it. And when it comes to the lease and his ability to operate under the lease, the city didn't revoke the lease. The city issued, under its discretion, a stop work order. The city has wide discretion and arguably ambiguous discretion. But normally you follow protocols if there is not an emergency. Notice and an opportunity to cure. That's what normally happens. Somebody comes out and they say, hey, Fred, you're not in compliance. You've got to get in compliance real quick, man. And instead, they come out with a 28 – none of this makes sense. And I still don't understand the back story. There's got to be a reason that this was done. I mean, unless Mariani just cowboys up for everything. I don't – and I doubt that. Well, he exercised his discretion in this particular case. His exercise of discretion shows us that there's not a protected property interest. We don't have substantially similar comparisons between the other two bars. Wait, there are? You're saying that an L&I's exercise of discretion can establish as a matter of law what a property interest is? Is that what you just said? Not as a matter of law, but we know from the case law that you – You said it shows it's not a property interest. I'm sorry? You said it shows it's not a property interest. Knowing that there's discretion that officers have within the Department of DPLI, basically to issue all of the occupancy permits, to require people to comply with the occupancy permits, and then afterwards to enforce the occupancy permits. Afterwards. Interesting. After what? After business opens, essentially. Shows that there is discretion. And in this particular case, we know there's ambiguous discretion because there's not necessarily a definition of what an emergency is. And those factors erode or indicate that there is a lesser probability of a property interest in the occupancy permit. Interesting. All right.  Thank you. Mr. Tucker, rebuttal? Governor, I have no rebuttal, unless you all have any specific questions for me. I have nothing.